*MHN*

**FILED**

3-26-2010

MAR 2 6 2010

JUDGE AMY ST. EVE
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 122-6 |
| vs. | ) | |
| | ) | Hon. Amy J. St. Eve |
| KEVIN WADDELL | ) | United States District Court Judge |

## PLEA AGREEMENT

1.      This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant KEVIN WADDELL, and his attorney, GARY RAVITZ, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(B), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.      The indictment in this case charges defendant with conspiracy to possess with intent to distribute and to distribute controlled substances, namely in excess of 5 kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, and in excess of 50 grams of cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2. The indictment also charges defendant in a forfeiture allegation.

3.      Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the indictment, which charges defendant with conspiracy to possess with intent to distribute and to distribute controlled substances, namely in excess of 5 kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, and in excess of 50 grams of cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2. The indictment also charges defendant in a forfeiture allegation.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the indictment.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt.

Beginning no later than in or around 2007, and continuing until at least on or about February 12, 2008, defendant Kevin Waddell ("WADELL") conspired with Barry Ware and others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, in excess of 5 kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, and in excess of 50 grams of cocaine base

2

in the form of crack cocaine ("crack cocaine"), a Schedule II Narcotic Drug Controlled

Substance, in violation of Title 21, United States Code, Section 846.

More specifically, from between in or about 2007 to on or about February 12, 2008,

WADDELL purchased wholesale quantities of cocaine from and with Barry Ware.  On

occasion, Barry Ware delivered the cocaine to WADDELL.  On other occasions, other

individuals, including Laquinta Moffett, delivered the cocaine to WADDELL.  WADDELL

cooked the cocaine he purchased from Barry Ware into crack cocaine, which he distributed

in wholesale quantities to customers in the Joliet area.

For example, shortly before June 2, 2007, Barry Ware fronted at least one kilogram

of cocaine to WADDELL, meaning that WADDELL paid Barry Ware for the cocaine after

WADDELL sold it.  WADDELL cooked the kilogram of cocaine into crack cocaine and

resold it in wholesale quantities to customers in the Joliet area.  By June 2, 2007, WADDELL

had collected approximately $20,000 in proceeds from his sale of this crack cocaine.  On

June 2, 2007, WADDELL delivered those proceeds to Barry Ware in the Joliet area.

On June 5, 2007, WADDELL had a series of conversations with Barry Ware about

their interest in purchasing cocaine together from a cocaine supplier, Individual S.  During

their conversations, Barry Ware told WADDELL that he was attempting to buy at least one

kilogram in addition to the cocaine that WADDELL was interested in buying.  WADDELL

told Barry Ware that he had $21,000 to purchase 1 kilogram of cocaine.  Barry Ware told

WADDELL that he would need an additional $1,500 because Individual S was selling

3

kilograms of cocaine for $22,500 per kilogram.  WADDELL agreed to pay $22,500 for 1 kilogram of cocaine.  Later that same day, Barry Ware directed WADDELL to deliver the money for WADDELL's purchase of 1 kilogram of cocaine to Barry Ware at Linnea Massey's home in Joliet.  Soon after that, WADDELL delivered the money for his purchase of 1 kilogram of cocaine to Barry Ware in the driveway of Linnea Massey's home in Joliet. On or about June 6, 2007, Barry Ware distributed approximately 1 kilogram of cocaine to WADDELL.  WADDELL subsequently cooked the cocaine into crack cocaine and distributed it in wholesale quantities to customers in the Joliet area.

On September 13, 2007, WADDELL had a series of conversations with a person who, unbeknownst to him, was cooperating with law enforcement (hereinafter "CS-4"), regarding CS-4's interest in purchasing 2 1/4 ounces of crack cocaine from WADDELL.  WADDELL directed CS-4 to meet him at a home located on 4th Avenue in Joliet.  Later that same day, WADDELL met with CS-4 in the front yard of a home on 4th Avenue in Joliet.  WADDELL gave CS-4 plastic wrap containing 55.3 grams of crack cocaine.  At that same time, CS-4 gave WADDELL $1,200 for the crack cocaine.  WADDELL had cooked cocaine he purchased from Barry Ware into the crack cocaine he distributed to CS-4.   Between late 2007 and February 12, 2008, WADDELL rented an apartment on Rock Run Drive in Crest Hill, Illinois (hereinafter "the Crest Hill apartment") at which he stored wholesale quantities of cocaine and crack cocaine.  On February 12, 2008, WADDELL was storing approximately 171.4 grams of crack cocaine in the Crest Hill apartment.  WADDELL had cooked cocaine

4

he purchased from Barry Ware into the crack cocaine he was storing in the Crest Hill apartment on February 12, 2008. WADDELL intended to distribute that crack cocaine in wholesale quantities to customers in the Joliet area.

Based on the foregoing, the amount of controlled substances involved in the conspiracy, with which WADDELL was personally involved and also that which was reasonably foreseeable to WADDELL, was approximately one kilogram of cocaine and 2,226.7 grams of crack cocaine.

7.    Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement dated April 30, 2008. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range for defendant:

In or around 2002, WADDELL's step-brother, Gary McDonald, approached McDONALD looking for a place to store cocaine. For three to four months in 2002, WADDELL allowed Gary McDonald to store "eight ball" or one-eighth ounce quantities of cocaine at WADDELL's home in Joliet.    During that time, Gary McDonald came to WADDELL's home three times a month to drop off cocaine. Each time, Gary McDonald stored ten to 20 one-eighth ounce quantities of cocaine.

For the first two months, Gary McDonald retrieved the cocaine from WADDELL's home each time he was ready to sell it. After two months, WADDELL told Gary McDonald that he could sell cocaine for Gary McDonald. Gary McDonald agreed to let WADDELL

do so.  For the next three or four months, WADDELL distributed approximately three 2 1/4 ounce (63 gram) quantities of cocaine for Gary McDonald.  During that period of time, WADDELL moved out of his home in Joliet, and into the Wingate Hotel in Joliet.  While staying at the hotel, WADDELL stored the cocaine he was selling for Gary McDonald at the home of WADDELL's mother in Joliet.

In or around 2003, WADDELL moved to Aurora.  Around that same time, Barry Ware approached WADDELL.  Barry Ware told WADDELL that he had heard that WADDELL was distributing cocaine for Gary McDonald.  WADDELL understood that Gary McDonald was getting his cocaine from Barry Ware.  Barry Ware offered to sell cocaine directly to WADDELL.  WADDELL accepted Barry Ware's offer.  For the next six months, Barry Ware partially fronted between 2 1/4 to 4 ½ ounces of cocaine to WADDELL two times a month.  In late 2003 or early 2004, WADDELL moved to Naperville, where he lived for the next six to eight months.  During that period of time, Barry Ware partially fronted between 4 ½ and 9 ounces of cocaine to WADDELL three to four times a month.  Between 2003 and July 2004, WADDELL resold the cocaine he purchased from Barry Ware in wholesale quantities to customers in the Joliet area.

In July 2004, WADDELL moved to Buffalo, New York, where he lived until May 2005.  During that period of time, WADDELL traveled to the Joliet area at least two times a month to obtain cocaine from Barry Ware.  On those occasions, Barry Ware partially fronted between 4 ½ and 9 ounces of cocaine to WADDELL.  WADDELL resold the cocaine

in wholesale quantities to customers in the Buffalo area.  In May 2005, WADDELL moved back to the Joliet area, where he remained until his arrest in February 2008.  Upon his return to the Joliet area, Barry Ware partially fronted WADDELL between 9 ounces and 1 kilogram of cocaine at least one or two times a month.  WADDELL had difficulty selling the cocaine in wholesale quantities to customers in the Joliet area.  WADDELL learned that he could more easily sell crack cocaine than powder cocaine.

Shortly after that, Individual NN showed WADDELL on how to cook cocaine into crack cocaine using cocaine that WADDELL had provided to Individual NN.  Individual NN put powder cocaine in a Pyrex dish and then add baking soda and water to that dish.  Individual NN then put the Pyrex dish containing the mixture of cocaine, baking soda, and water in the microwave for a number of minutes.  Upon taking the Pyrex dish out of the microwave, Individual NN added cold water to the mixture and stirred it.  Individual NN showed WADDELL that the resulting mixture hardened into crack cocaine, which ranged in color from white yellow.  WADDELL gave Individual NN a portion of the crack cocaine as payment for having demonstrated how to cook crack cocaine.  WADDELL subsequently cooked the cocaine he purchased from Barry Ware into crack cocaine.

By late 2005, Barry Ware was partially fronting WADDELL between 9 ½ ounces and 1 kilogram of cocaine three to four times a month.  During that time, WADDELL had a conversation with Barry Ware regarding the manufacturing of crack cocaine.  Barry Ware told WADDELL that there was another way to cook crack cocaine.  Barry Ware instructed

WADDELL to pour the water out of the cocaine, baking soda, and water mixture while it was hot and then add baking soda.  WADDELL found that by following Barry Ware's instructions rather than those of Individual NN, he could produce twice as much crack cocaine.  For example, by following Barry Ware's instructions, WADDELL could convert 1 kilogram of cocaine into 2 kilograms of crack cocaine.

Between early 2006 and February 12, 2008, Barry Ware partially fronted an average of 1 kilogram to WADDELL every week, except for those times when there was a cocaine shortage.  On occasion during that period of time, Barry Ware partially fronted a smaller quantity of cocaine, 9 ½ ounces, to WADDELL.  On other occasions, Barry Ware partially fronted larger quantities of cocaine, 2 kilograms, to WADDELL.  WADDELL cooked the cocaine he purchased from Barry Ware into crack cocaine.

Between May 2005 and February 2008, WADDELL typically met Barry Ware in person to deliver the money WADDELL owed to Barry Ware for the cocaine.  WADDELL met Barry Ware at a number of locations in the Joliet area, including the home of LaQuinta Moffett and the home of Linnea Massey.  During that same period of time, WADDELL met people who supplied Barry Ware with cocaine, including Individual OO, Individual S, and Gregorio Rodriguez.  Individual OO and Individual S were father and son.  On occasion, WADDELL purchased cocaine directly from those individuals.

Between 2005 and 2006, WADDELL understood that Individual OO served as one of Barry Ware's cocaine suppliers.  On one occasion during that period of time, Barry Ware

and WADDELL drove to Individual OO's home. Barry Ware went inside of the home and returned shortly thereafter with two kilograms of cocaine. Barry Ware kept one of the kilograms of cocaine and gave the other kilogram of cocaine to WADDELL. In or around 2006, Individual OO passed away.

In late 2006, WADDELL met Gregorio Rodriguez, who WADDELL understood supplied Barry Ware with cocaine when Individual OO was unable to do so. WADDELL never received cocaine directly from Gregorio Rodriguez. Rather, Barry Ware brokered the cocaine transactions with Gregorio Rodriguez. WADDELL saw Gregorio Rodriguez six or seven times at the locations at which Barry Ware received the cocaine. On one of those occasions, WADDELL saw Barry Ware receive 4 kilograms of cocaine from Gregorio Rodriguez. Barry Ware fronted 1 kilogram of cocaine to WADDELL.

In or around 2007, WADDELL and Barry Ware met Individual S at the home of LaQuinta Moffett. WADDELL understood that Individual S had taken over his father's drug distribution business. During the meeting, WADDELL paid $60,000 to Individual S up front for the purchase of 3 kilograms of cocaine. Individual S left LaQuinta Moffett's home and returned shortly thereafter with 5 kilograms of cocaine. Individual S gave 3 kilograms of cocaine to WADDELL and 2 kilograms of cocaine to Barry Ware. On another occasion, WADDELL met Individual S at WADDELL's home. During the meeting, WADDELL gave $21,000 to Individual S for the purchase of 1 kilogram of cocaine. Individual S left WADDELL's home and returned shortly thereafter with 1 kilogram of cocaine.

Between 2007 and 2008, WADDELL and Barry Ware brokered approximately five cocaine transactions between Individual S and a group of individuals from New York who wanted to purchase cocaine. Barry Ware and WADDELL were responsible for coordinating the transaction between the New Yorkers and Individual S. Each time, the transaction involved 6 kilograms of cocaine. Each time, Individual S partially fronted the cocaine to the New Yorkers. WADDELL earned $1,000 per transaction.

Between 2005 and February 2008, WADDELL resold the crack cocaine in wholesale quantities to customers in the Joliet area. WADDELL sold the majority of his crack cocaine to Vice Lords in the "south end" area of Joliet. In 2007, WADDELL met Bobby Mitchell. WADDELL understood Bobby Mitchell to sell ounce quantities of crack cocaine in the Joliet area. WADDELL sold Bobby Mitchell one ounce of crack cocaine on several occasions when Barry Ware was out of town and unable to supply Bobby Mitchell. Each time, WADDELL sold the crack cocaine to Bobby Mitchell up front for $600 per ounce. Each time, the transaction took place outside of Bobby Mitchell's home in the Joliet area.

8. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years.  Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense.  This offense also carries a maximum fine of $4,000,000.  Defendant further understands that the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

b.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines.  Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.      For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

11

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2009 Guidelines Manual.

b.    **Offense Level Calculations.**

i.    The base offense level for the charge in Count One of the indictment is 36, pursuant to Guideline §§2D1.1(a)(3) and (c)(1), because the amount of controlled substances involved in the offense for which defendant is accountable is approximately one kilogram of cocaine and 2,226.7 grams of cocaine base in the form of crack cocaine. Pursuant to the drug equivalency table set forth in Guideline §2D1.1, cmt. n. 10, these controlled substances are equivalent to at least approximately 44,554 kilograms of marijuana, resulting in a combined base offense level of 38. Pursuant to Guideline §2D1.1, cmt. n.10(D), because this offense involves cocaine base in the form of crack cocaine and cocaine, the combined base offense level should be reduced by two levels to 36.

ii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested

financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        iii.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

        c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 6 and defendant's criminal history category is III:

        i.    On or about February 16, 1994, defendant was convicted of unlawful use of a weapon in the Circuit Court of Will County and sentenced to twenty-four months' probation. On or about June 20, 1995, defendant's probation was revoked in the Circuit Court of Will County and defendant was sentenced to two years' imprisonment. Pursuant to Guideline §4A1.1(a), defendant receives three points for this conviction.

        ii.    On or about June 20, 1995, defendant was convicted of possession of a controlled substance in the Circuit Court of Will County and sentenced to two

years' imprisonment. Pursuant to Guideline §4A1.1(a), defendant receives three points for this conviction.

   iii. On or about January 28, 2002, defendant was convicted of possession of a controlled substance in the Circuit Court of Will County and sentenced to 24 months' probation. Pursuant to Guideline § 4A1.2(a)(1), defendant receives no points for this conviction because it involves conduct that was part of the instant offense

   d. **Anticipated Advisory Sentencing Guidelines Range.**  Therefore, based on the facts now known to the government, the anticipated offense level is 33, which, when combined with the anticipated criminal history category of III, results in an anticipated advisory Sentencing Guidelines range of 168 to 210 months' imprisonment, in addition to any supervised release and fine the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment.

   e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation

officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

   f. Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(C), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

  12. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

  13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant

has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline §5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and statutory minimum sentence and to impose the specific sentence agreed to by the parties as outlined below.  Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence rests solely with the Court.

14.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation.  If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable,  to depart from the applicable Guideline range and statutory minimum sentence, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66% of the low end of the applicable Guideline range or 66% of the low end of the statutory minimum sentence, whichever is greater. Defendant shall be free to recommend whatever sentence he deems appropriate.  Defendant understands that the decision to depart from the applicable advisory guidelines range and statutory minimum sentence, if it applies, rests solely with the Court.  If the Court determines that the sentence should be reduced in light of the disparity between the offense levels for crack and powder cocaine, the government will not object to a reasonable additional adjustment on that basis.  Should the Court choose to make such an adjustment based on the

disparity between the offense levels for crack and powder cocaine, however, the government will object to any sentence that is below the number of months equal to 66% of the low end of the advisory Guidelines range that would apply if the crack cocaine quantity were treated as powder cocaine.

15.    If the government does not move the Court, pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth above, the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. § 3553(e).

16.    The parties further agree, pursuant to Title 18, United States Code, Section 3583(d), that the sentence to be imposed by the Court shall include, as a condition of any term of supervised release imposed in this case, a requirement that defendant repay the United States $1,200 as compensation for government funds that defendant received during the investigation of the case.

17.   Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.   After sentence has been imposed on the count to which defendant pleads guilty, the government will move to dismiss the forfeiture allegation as to this defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

19.   This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 08 CR 122-6.

20.   This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

21.   Defendant understands that by pleading guilty he surrenders certain rights, including the following:

18

a.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.  The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.      **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and

including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement.  In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to  file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255.  Finally, if the Court imposes a term of imprisonment that is at or below the number of months that equals 66% of the low-end of the advisory Guidelines range that would apply if the crack cocaine quantity were treated as powder cocaine, defendant waives his right to subsequently seek a reduction of sentence based directly on a change in the law as it relates to the crack cocaine/powder disparity that may be applicable to defendant, even if the change in the law is made retroactive by an Act of Congress, by the Supreme Court, or by the United States Sentencing Commission acting pursuant to Title 18, United States Code, Section 3582(c)(2) or pursuant to any other authority.  The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

      c.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs.  Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

22.     By entering this plea of guilty, defendant also waives any and all right the defendant may have, pursuant to 18 U.S.C. §3600, to require DNA testing of any physical evidence in the possession of the Government. Defendant fully understands that, as a result of this waiver, any physical evidence in this case will not be preserved by the Government and will therefore not be available for DNA testing in the future.

### Presentence Investigation Report/Post-Sentence Supervision

23.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

24.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence

for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

25.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

26.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

27.     Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

28.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term

23

of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

30.     Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney.   Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:   3/26/2010.

PATRICK J. FITZGERALD
United States Attorney

KEVIN WADDELL
Defendant

TERRA L. BROWN
Assistant U.S. Attorney

GARY RAVITZ
Attorney for Defendant